UNITED STATES *v.* H. F. RITCHIE & Co. (No. 4290) [1]

United States Court of Customs and Patent Appeals, May 29, 1940

*Webster J. Oliver*, Assistant Attorney General (*Charles D. Lawrence*, Special Assistant to the Attorney General, and *Joseph F. Donohoe*, special attorney, of counsel), for the United States.

*B. A. Levett* for appellee.

[Oral argument April 9, 1940, by Mr. Lawrence and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

This is an appeal by the Government from the judgment of the United States Customs Court, Third Division, sustaining a protest whereby the importer seeks recovery of certain duties assessed and collected upon an importation from Dominica, British West Indies, of merchandise described in the invoice as "raw lime juice," entered May 24, 1937, at the port of New York City.

The merchandise was classified and duty assessed upon it as "fruit juices, N. S. P. F.," under that portion of paragraph 806 (a) of the Tariff Act of 1930, which reads:

PAR. 806. (a) Cherry juice, prune juice, or prune wine, and all other fruit juices and fruit sirups, not specially provided for, containing less than one-half of 1 per centum of alcohol, 70 cents per gallon; * * *.

[1] C. A. D. 124.

Importer claims under that part of paragraph 48 of the act which reads:

\* \* \* juice of \* \* \* limes, \* \* \* unfit for beverage purposes, 5 cents per pound.

In the decision of the trial court it is said:

The process by which this commodity is produced is described in the testimony as follows: The limes are run into a 3-roller mill which extracts the juice and crushes the entire lime; that the extracted juice contains the whole lime aside from the skin. After leaving the rollers the juice is passed through a strainer to take out the seeds. It is then run into hogsheads averaging about 50 gallons, in which condition it is shipped to this country. It was further shown by the testimony that this crushing process operates to squeeze the oil out of the skins as well as the juice from the body of the fruit.

From the foregoing description of the method of manufacture of this imported product it is clear that the same may be designated as crude lime juice. By that we mean lime juice that is imported as it was expressed from the limes without having undergone any further conditioning or processing. The question to be determined is whether the testimony in this case shows that such lime juice is unfit for beverage purposes. If it is unfit for beverage purposes then the importers' protest should be sustained. If, as imported, it is fit for beverage purposes, then the Government's classification should be sustained, because there appears to be no other paragraph under which duty could properly be taken.

\*       \*       \*       \*       \*       \*       \*

The importers called an experienced toxicologist to the stand, the effect of whose testimony was that the imported commodity if used as a beverage would be deleterious to the human system "because of the high volatile oil or essential oil content, which reads 1.8 cc. in 100 cc. of the material." He further elaborated upon the amount of such oils and stated that it ranges from 1 to 5 drops and gave the toxicological effect of these oils. He was then asked and permitted to answer the following question:

"What would you say as to using it if it were diluted with water or other products?—A. If diluted, the same as with any other toxic substance—for instance, a strychnin solution is a volume poison but if you dilute it enough you can take it in small amounts and then it is a tonic, it is a stimulant. So this material also; if you dilute it enough then you can take it. But even in the diluted condition it is not proper therapeutic procedure to take even the diluted portion in large amounts every day for long periods."

The Government chemist gave testimony that contradicted the plaintiffs' witnesses as to the amount of volatile oil in the imported commodity, but no evidence was produced which contradicts the testimony offered by the plaintiffs to the effect that the article as imported is unfit for beverage purposes.

\*       \*       \*       \*       \*       \*       \*

It is our opinion that the importers have overcome the presumption of correctness attaching to the collector's action, in that it has been proven that the lime juice here involved is unfit for beverage purposes, that is, it is unfit for use in beverages. We therefore sustain the claim for assessment under paragraph 48, supra, at 5 cents per pound.

It is obvious from its decision that the trial court applied the customary rule to the effect that merchandise is classifiable for duty purposes in its condition as imported.

Before us the findings of fact by the trial court are not seriously challenged by counsel for the Government. There is a suggestion that by proper dilution the juice in its condition as imported might be used as, or in, a beverage without injury to the person, but the Government brief concedes that "Exhibit 1 [a sample of the imported juice], in its imported condition, is not customarily consumed as a beverage," and in the oral argument before us counsel for the Government very frankly stated it was not "potable" in its imported condition. We think the concessions so made were proper, and from the record in the case we fully agree that the juice in its imported condition was unfit for beverage purposes.

Therefore, inasmuch as the imported merchandise was of a character falling squarely within the express language of paragraph 48, *supra*, and not elsewhere described in the Tariff Act of 1930, ordinarily it would seem unnecessary to go further in this decision than to affirm the judgment of the trial court.

Before us, however, the Government has advanced a theory which requires consideration. This theory, as stated in its brief, is that "Paragraph 48 is intended to provide for only those articles which are used in the manufacture of citric acid and which are inherently unfit for human consumption," and to support the theory certain legislative history is cited.

We may say at this point that there is nothing in the decision of the trial court or elsewhere in the record to indicate whether that theory was pressed before, or even suggested to, that tribunal. The decision states that the Government relied principally upon the case of *Crosse & Blackwell* v. *United States*, T. D. 48556, 70 Treas. Dec. 380, which related to a commodity apparently derived from merchandise like that involved by processes applied before importation. It is clear, as the trial court pointed out, that the merchandise in that case, as imported, was different in condition from that here involved. That case is cited before us but it is not claimed to be controlling.

What the Government actually claims before us is, in substance, that the limes used in making citric acid are customarily faulty and imperfect, or even partially decayed limes; that the juice of such limes is *inherently* unfit for human consumption and that it was intended to cover only this character of lime juice in paragraph 48, *supra*.

Just here we remark that no evidence was offered during the trial of this case to establish the fact, if it be a fact, that only faulty, imperfect or decayed limes are customarily so used. The evidence respecting the use made of the imported merchandise is limited to the use made of it by the importers which by processes, described in detail, derived from it a product intended for beverage use, but, so far as the record discloses, citrate of lime might be readily derived from it if

desired. The analysis of the Government chemist disclosed a citric acid content of approximately 8 per centum. Whether this is greater or less than the content in juice made from imperfect or decayed fruits we are not advised.

However, the Government cites certain legislative history and urges that it properly may be looked to, and that it supports the theory advanced. Assuming, without conceding, that there is an ambiguity in the involved paragraphs rendering it proper to look to the history relied upon, we here summarize such parts of it as appear to be of any possible materiality.

In the Tariff Act of 1922, paragraph 49 provided only for citrate of lime at 7 cents per pound. "Lemon juice, lime juice, and sour orange juice * * * containing not more than 2 per centum of alcohol" were embraced in paragraph 1610, a paragraph of the free list. Paragraph 806 of the 1922 act was the same as paragraph 806 (a) of the 1930 act quoted, *supra*.

While the latter act was in course of preparation representatives of the citrus fruit industry appeared before the Committee on Ways and Means of the House of Representatives, one of such representatives being a Mr. E. T. Cassel, president of what was known as the byproducts plants, owned by the California Fruit Growers' Exchange. He, in fact, made two appearances, the first being in connection with paragraphs 49 and 1610 (as well as some others of no importance here) of the 1922 act, and a later one in connection with paragraph 806 of that act.

At his first appearance Mr. Cassel discussed the state of the citric acid industry—that is the manufacture of citric acid and citrate of lime, pointing out, in substance, that while there was a duty on citrate of lime, the juices from which it was produced were on the free list. In his statement he told the committee that "citric acid has been imported into the United States all these years in two crude materials, citrate of lime and concentrated citrus juices"; that the latter materials were on the free list (evidently referring to paragraph 1610 of the Tariff Act of 1922); that in consequence no dutiable citrate of lime was being imported, but instead importations were being made of the duty-free concentrated citrus juices, and so, on behalf of the industry, he asked specifically that "the tariff on citrate of lime at 7 cents a pound be not changed; * * * and that the concentrated citrus juices which until now have been on the free list be removed from the free list and be assigned a duty of 5 cents per pound to make it comparable with the citrate of lime, which is the other crude material."

We do not find in Mr. Cassel's statement, made upon the occasion of his first appearance before the committee, any reference to uncon-

centrated citrus fruit juices, nor was anything there said by him with respect to the beverage use of citrus fruits juices, but in a brief filed with his statement it was asked that "LEMON JUICE, LIME JUICE, AND SOUR ORANGE JUICE, UNFIT FOR USE IN BEVERAGES—PARAGRAPH 1610" (free) be provided with a duty of 5 cents per pound. It should be borne in mind that the phrase "unfit for use in beverages" was not in the Tariff Act of 1922. See Tariff Readjustment Hearings 1929 (H. of R.), pages 116–127.

When Mr. Cassel appeared before the committee the second time his discussion related to citrus juices used in beverages, and his request was that paragraph 806 of the 1922 act be changed so that orange juice, lemon juice, lime juice, and grapefruit juice be included therein—that is that those juices when "fit for beverage purposes" be given the same rate of duty as cherry juice, prune juice, etc. See Tariff Readjustment, *supra*, pages 5330 to 5332.

In his statement there made Mr. Cassel told the committee that the concentrated citrus juices to which he had referred in his former statement were "not fit for beverage purposes," but were "imported for their citric acid content and for that purpose only," but added that other citrus juices fit for beverage purposes were being imported. There was no statement by him as to how such other juices were being classified under the Tariff Act of 1922, but he asked that paragraph 806 of that act be enlarged so as to include "all the juices of the citrus fruits," fit for beverage purposes. A brief filed with the committee on behalf of the industry suggested certain language as being appropriate to the end sought.

It is unnecessary to pursue the representations made by those appearing before the committee on behalf of the citrus fruit industry in further detail.

The Congress altered the citrus fruit juice provisions of the 1922 act in material respects. "Lemon juice, lime juice, and sour orange juice" were omitted from the free list in the 1930 act. "Lime, citrate of," the only article provided for in paragraph 49 of the 1922 act was continued (at the same duty rate) in paragraph 48 of the 1930 act, and additions were made so that the full text of the latter reads:

PAR. 48. Lime, citrate of, 7 cents per pound; juice of lemons, limes, oranges, or other citrus fruits, unfit for beverage purposes, 5 cents per pound.

Another change was the insertion in paragraph 806 of the 1930 act, as subparagraph (b) the following:

(b) *Concentrated* juice of lemons, oranges, or other citrus fruits, fit for beverage purposes, and sirups containing any of the foregoing, all the foregoing, whether in liquid, powdered, or solid form, 70 cents per gallon on the quantity of un-

concentrated natural fruit juice contained in such concentrated juice or sirup as shown by chemical analysis. [Italics ours.]

When the act as finally enacted is compared with the requests and suggestions made before the Committee on Ways and Means the following state of facts is found:

(a) The Congress was asked to provide a rate of duty of 5 cents per pound on citrus fruit juices unfit for beverage purposes, and did so in paragraph 48, *supra*. The oral statement before the committee indicated that the organization making the request had in mind only *concentrated* citrus fruit juices unfit for beverage purposes but Congress did not limit the paragraph by using the term "concentrated." (b) Congress was asked to provide a duty rate for such citrus fruit juices as are fit for beverage purposes. This request apparently was broad enough to embrace both concentrated and unconcentrated juices of that character but Congress limited the paragraph to such as are concentrated.

From the foregoing it would seem that no specific provision is contained in either paragraph 48, *supra*, or 806 (b), *supra*, for *unconcentrated* lime juice that is *fit* for beverage purposes, although the request was made of Congress that paragraph 806 of the act of 1922 be enlarged to include it. Just what deductions should be drawn from the failure so to provide need not be discussed here because no commodity of that type is before us.

It should be distinctly understood that by quoting from the statements and representations made before the committee of Congress there is no intention of implying that they have any probative value in this proceeding. Definitely they have none here. In the case of *United States* v. *Paramount Publix Corp.*, 22 C. C. P. A. (Customs) 454, 460, T. D. 47453, we had occasion to say:

When the Committee on Finance of the United States Senate had under consideration the change above noted, parties interested in bringing about such a change were heard by such committee. (Hearings, Tariff Act of 1929, Volume III, page 946 *et seq*.) Such hearings show that the committee made close inquiry of the interested parties as to what the changes would mean if made and a colloquy involving that question took place between one of the interested parties and a member of the committee, which we will not quote here.

This circumstance has been called to our attention as being a part of the legislative history of the provision. While such subject matter may be related to the enactment of the provision, we feel certain it should not be resorted to for the purpose of showing the intent of the legislature. We think it would be an unsafe practice for courts to permit such a consideration to be controlling since the enactment of the provision in the language before us might have been with an intent wholly different from that indicated by the witnesses.

So far as the instant case is concerned we have recited the material substance of the statements, principally because presented as a part of the argument by the Government before us in support of its theory that Congress really did not intend to include all lime juices unfit for beverage purposes in paragraph 48, *supra*, but only such as are used solely for making citric acid. It is our view that, regardless of whether statements of the character involved would be proper for consideration under some circumstances, they do not sustain the theory contended for here, and that nothing in the text of the act sustains it.

It is suggested that the principle of this court's decision in the case of *Kubie & Co.* v. *United States*, 12 Ct. Cust. Appls. 468, T. D. 40668, following other cases therein cited is applicable here. It was there held that certain tankage, a product remaining after the extraction of certain other substances from slaughterhouse refuse, was properly classifiable under the 1913 tariff act as "substances used only for manure" rather than as a nonenumerated manufactured article. We think the instant case is clearly distinguishable from that case. The language there was "substances used only for manure" and the court found that the only practical use of the tankage was for mixing with other ingredients to make fertilizer. Here the phrase is "unfit for beverage purposes." The statute does not define the commodity affirmatively by its use, but negatively by its quality. Whatever may be its eventual use after further processing, it is unfit for beverage purposes in its imported condition.

Had the Congress desired to limit paragraph 48, *supra*, to such lime juice as is used only, or solely, for making citric acid, language could easily have been found to express such purpose. To hold with the Government theory here, in effect, would place the court in the attitude of reading into the statute a limitation which the legislative body did not see fit to express. The product here at issue is *eo nomine* described in paragraph 48, *supra*, and nothing has been presented which leads us to the conclusion that the trial court committed error.

Accordingly, the judgment is *affirmed*.